IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DEWAYNE WARREN,

       Plaintiff,

vs.                                    CASE NO. 1:15-cv-222-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for supplemental security income ("SSI") benefits pursuant to

Title XVI of the Social Security Act ("the Act"). (ECF No. 1.) The

Commissioner has answered (ECF No. 10), and both parties have filed

briefs outlining their respective positions. (ECF Nos. 19–20.) For the

reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on October 21, 2013,

alleging a disability onset date of April 12, 2013. (R. 198–203.) Plaintiff

alleged that he can longer work due to back pain, heart condition, post-

traumatic stress disorder ("PTSD"), anxiety, and chronic obstructive

pulmonary disease ("COPD"). (R. 69.) His application was denied initially

and upon reconsideration. (R. 111–13, 121–27.) Following a hearing on

January 27, 2015, an administrative law judge ("ALJ") issued a decision

unfavorable to Plaintiff. (R. 20–31.) The Appeals Council denied Plaintiff's

request for review. (R. 1–3.) On October 13, 2015, Plaintiff filed the instant

appeal. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

### III.  SUMMARY OF THE RECORD

**A.  Medical Evidence**

**1. Physical Health**

One of Plaintiff's reasons for his inability to work is his heart condition. On March 2, 2009, Plaintiff was admitted to Floyd Memorial Hospital for chest pain and chest palpitations. Dr. Srini Manchi noted that Plaintiff had a history of coronary artery disease, status post myocardial infarction ("MI"), stent placement, hypertension, hyperlipidemia, and possible sleep apnea. Plaintiff had an episode of bentricular fibrillation that resolved on its own during his admission to the hospital. (R. 332–33.)

Once admitted, Plaintiff underwent multiple examinations by different physicians. Dr. Kevin Serey's examination, including a radiograph of the chest, yielded normal findings of the heart size and pulmonary vascularity. Plaintiff's lungs were clear, and there was no bony or soft tissue

abnormality. (R. 330.) An echocardiogram was also performed on Plaintiff, which yielded normal results. (R. 347.) Dr. Eugene Fletcher evaluated Plaintiff, finding possible sleep apnea and possible restless leg syndrome. (R. 334–36.)

In addition to heart problems, Plaintiff also stated that he has back pain that impairs his ability to work. In June 2010, Plaintiff had an MRI due to low back pain. The results included disk desiccation and posterolateral disk protrusion, without significant stenosis or focal nerve root compression, as well as mild lower lumbar facet degenerative changes bilaterally. There was, however, no acute abnormality. (R. 361–62.)

Also in June 2011, Plaintiff again visited Dr. Manchi regarding his heart condition. He did not have chest pain or shortness of breath during this visit, although he was experiencing chest congestion. His physical exam yielded normal results during this visit. (R. 378.)

Plaintiff was admitted to Clark Memorial Hospital on August 21, 2011, complaining of chest pain and possible sleep apnea. An echocardiogram was performed on Plaintiff. Although there was a mild concentric left ventricular hypertrophy and the left atrium was mildly dilated, all other results were normal. Plaintiff also underwent a pulmonary consultation. Dr.

Kutmah found that Plaintiff had shortness of breath likely due to COPD exacerbation. (R. 356–57.) A stress cardiolite was also done, which revealed a chest wall attenuation artifact versus small anterior wall infarction. (R. 358.) Overall, Dr. Kutmah determined that there was no significant obstructive coronary disease. Further, Plaintiff's discomfort was determined not to have a cardiac origin. It was recommended that Plaintiff stay on the same medication for treatment. (R. 354–55.)

In 2011 and 2012, Plaintiff was incarcerated at Clark County Jail. While there, Plaintiff complained of mental and physical problems, but observations of Plaintiff frequently contradicted his complaints. On August 24, 2011, Plaintiff stated that he fell getting down from the top punk, injuring his back. Then on December 16, 2011, Plaintiff complained of pain at a 10/10, stating that opiates are the only thing that give him relief without a facet injection. Despite his complaint about the severity of his pain, Plaintiff was able to walk without assistance, sit for long periods of time without changing position, and stand from sitting without difficulty.[3] (R. 399–401.)

---

[3] Plaintiff also had injuries on October 24, 2011, when he cut both of his thumbs on razors, and on December 29, 2011, when Plaintiff had two black eyes and a bruised chin. Plaintiff stated that he fell, and he refused medical treatment. (R. 400.)

In January 2012, after Plaintiff fell injuring his lower back, Plaintiff received an MRI by Dr. Terry Williams of his lumbar spine. The MRI revealed mild degenerative disk disease and facet anthropathy, with mild foraminal narrowing that was unchanged from June 2010. Further, there was no acute disk herniation, central stenosis, or neural compression, nor was there any pathologic enhancement. (R. 222–24.)

Plaintiff then had multiple complaints about chest pain as well as difficulty walking. On January 13, 2012, Plaintiff rated his chest discomfort a 5/10. His EKG, however, revealed normal sinus rhythm without ectopy. He also complained of having a difficult time walking, but he walked steadily without a limp or drag. On February 1, 2012, Plaintiff requested hydocodone at night for the pain, but he also admitted to climbing stairs, sitting for long periods, and being able to care for himself without assistance. (R. 397–99.)

Plaintiff returned to Clark Memorial Hospital on February 5, 2012 due to chest pain. He was diagnosed with anxiety and gastroesophageal reflux disease ("GERD"). (R. 367–68.) He arrived ambulatory with a steady gait, although he complained of chest pressure and nausea. (R. 383.) Despite his complaints of pain, his x-ray examination resulted in normal findings.

There were no bony abnormalities, the heart and mediastinum were within normal limits, and there was no opacity within the lungs to suggest an active pulmonary disease. (R. 374.)

After returning to Clark County Jail, Plaintiff complained of back and joint pain on February 6, February 8, and February 28, 2012.[4] Despite his complaints of pain up to an 8/10, he was able to walk with a normal gait and no limp, sit in one position for extended periods of time, and had no difficulty sitting on the exam table or standing from the sitting position. Plaintiff was also observed climbing and descending stairs without the handrail. (R. 394–96.)

Plaintiff visited Cardiovascular Associates of Southern Indiana, P.C. for a follow-up regarding his heart on February 15, 2012. Plaintiff did not have any symptoms of chest pain or shortness of breath. Notably, Dr. Manchi stated that Plaintiff was doing very well. (R. 376.)

On September 19, 2012, Plaintiff visited Lake Cumberland Regional Hospital due to swelling in the throat and difficulty breathing. Plaintiff had peritonsillar cellulitis. Notably, during a physical examination of Plaintiff, he was in no apparent acute distress, and his heart was normal. An operation

---

[4] On April 25, 2012, Plaintiff requested tylenol for his pain. (R. 394.)

was performed to drain the right peritonsillar abscess and to remove his tonsils. Plaintiff went home on September 21, 2012. (R. 419–24.)

Plaintiff was later injured while delivering newspapers on April 12, 2013. He went to Lake Cumberland Regional Hospital, where he told doctors that unknown men assaulted him with a pipe. He had face swelling, pain, and bleeding, and he rated his pain a 10/10. The CT scan revealed no intracranial abnormality, although Plaintiff had multiple contusions within the left face, left periorbital, and left scalp. Apart from the injuries to Plaintiff's head resulting from the assault, he did not have back pain or any other notable physical or mental problems. (R. 460–69, 476.)

Plaintiff returned to Lake Cumberland Regional Hospital on April 17, 2013. He reported blurred vision and dizziness, but he denied everything else, including anxiety, depression, back ache, and difficulty breathing. His physical exam yielded normal findings, and the doctor concluded he had postconcussive syndrome. (R. 447–54.)

Plaintiff later began suffering from neck and low back pain, so he had an MRI of his lumbar spine in June 2013. That MRI did not reveal any evidence of acute bone fractures; it showed degenerative disc disease. He also had an MRI on his cervical spine. This also did not reveal any

fractures, and the result was multilevel discogenic disease. (R. 443–46.)

On April 4, 2014, Plaintiff visited Palms Medical Group. He complained of hypertension. His condition was stable as to his physical state. The physical examination of Plaintiff was unremarkable: his gait was normal as was his heart. (R. 499–504.)

On October 22, 2014, Plaintiff was admitted to Shands Hospital. Plaintiff presented with chest pain from hoisting a deer while hunting.[5] At that time, Plaintiff was noncompliant with cardiac and antihypertensive medications due to an inability to afford them. An EKG was performed, and the results of the EKG and blood work were normal. The doctors diagnosed Plaintiff with Stable Angina. During his overnight stay, Plaintiff did not experience any chest pain, although he did report mild back pain. Plaintiff's physical examination during this visit resulted in normal findings, including normal heart findings and a full range of motion in his upper and lower extremities. He did not have any joint swelling or tenderness.

---

[5] Another doctor's note described the incidence as "Patient was helping his son move a deer when he developed mid sternal chest pain with radiation into his left arm and diaphoresis." (R. 544.) Another note states that Plaintiff "reported that the pain began this morning while hanging a deer up to clean." (R. 551.) Another note mentions that Plaintiff experienced similar pain two days prior to this incident when he was shooting a bow and arrow, which resulted in bruising to his left arm. (R. 553.)

Although Plaintiff was informed of affordable medication changes, he left without receiving written instructions and without notifying any of the staff. (R. 538–43.)

### 2. Mental Health

Plaintiff did not present many records regarding his mental health. While incarcerated, Plaintiff requested a desire for medication due to heightened anxiety on March 2, 2012. He had a brief mental status exam at that time. Although he had limited concentration, judgment, and insight, the rest of the findings were normal. (R. 394–96.) In June 2013, Plaintiff went to Mountainview Behavioral & Neuroscience Center. Plaintiff complained of PTSD. During his mental status examination, his mood was depressed but his affect was appropriate. The diagnosis included depression, PTSD, and generalized anxiety disorder. (R. 481–83.) Then, on April 4, 2014, when Plaintiff visited Palms Medical Group for hypertension, he also complained of depression. Plaintiff stated that functioning was extremely difficult, but he demonstrated the appropriate mood and affect. (R. 499–504.)

## B.  Opinion Evidence

### 1. Dr. Benet

Dr. William Benet, a non-treating psychologist, performed a consultative mental examination on Plaintiff on January 23, 2014. At that time, Plaintiff's chief complaint included anxiety and PTSD, resulting from his time in the military and from his assault. Plaintiff told Dr. Benet that he had a history of panic attacks beginning in 2008, but he did not report any difficulty leaving the house or going into crowded public places. (R. 485–86.)

Plaintiff stated that his primary care provider, Dr. McGhee, treated him for anxiety and depression. Dr. McGhee also referred Plaintiff to a psychologist, whom he saw for a year and a half before Plaintiff moved to Florida in April 2012. The only available record included the psychiatric evaluation from Mountain View Behavioral & Neuroscience Center dated June 2013, including the diagnosis of PTSD, depressive disorder, and generalized anxiety disorder. Plaintiff did not report any other history of psychiatric treatment or mental health care. (R. 486.)

During the mental status examination, Plaintiff was alert, oriented, and cooperative. His thinking was organized and goal directed, and his

perceptions were accurate. Although his mood was worried, his affect was congruent and his attention and concentration were good. His immediate recall was above average, and his delayed recall was fair. His verbal reasoning and general intellectual ability were average, and his judgment and insight were adequate. (R. 487.)

The conclusions of Dr. Benet's examination were as follows. Plaintiff likely has mild-moderate depression, panic disorder without agoraphobia, and PTSD. His cognitive functioning was intact, with no impairment in memory or verbal reasoning. Accordingly, Dr. Benet found that Plaintiff should be able to perform work-related mental tasks involving understanding and memory, but he would likely have moderate difficulty performing tasks involving sustained concentration and persistence, social interaction, and adaptation. (R. 487.)

## 2. Dr. Chodosh

Dr. Lance Chodosh, a non-treating physician, performed a consultative physical examination on Plaintiff on February 4, 2014. Upon review of Plaintiff's medical records, Dr. Chodosh found mention of coronary artery disease, obstructive sleep apnea, hypertension, and hyperlipidemia. Dr. Chodosh also noted Plaintiff's history of back pain,

which is attributed to spondylolisthesis. Notably, although Plaintiff has undergone various injection therapies, he has not had any surgical treatment. (R. 494.)

Dr. Chodosh also assessed Plaintiff's ability to move about. He noted that Plaintiff's back pain limits his ability to bend over repetitively at the waist or to lift heavy objects. Further, due to Plaintiff's knee pain, he was unable to squat, although he was able to walk without using an assistive device. Plaintiff was independent in activities of daily living, but his pain limited his walking to one-quarter block and standing to fifteen minutes. He stated that he cannot sit comfortably for more than forty minutes, and his ability to bend at the waist was variable. Further, he could not squat and avoided lifting more than ten pounds. (R. 494–95.)

Dr. Chodosh performed a physical examination of Plaintiff. This exam yielded overall normal results. Plaintiff, however, did have slightly decreased range of motion in his neck. His chest exam resulted in a finding of a normal configuration with obesity. His heart was normal. His back and spine did not have any deformity, tenderness, or muscular spasm, but part of the physical assessment was difficult due to pain related to Plaintiff's hip movement. His motor function and manual dexterity were normal, and his

coordination was good. Plaintiff's standing balance and gait were normal, but Plaintiff indicated that he was unable to walk on his heels or toes or to squat and rise. (R. 495–97.)

Dr. Chodosh's findings were as follows. He concluded that Plaintiff had chronic back pain but that there were no physical signs of impairment. He also noted right knee pain, stating that an x-ray of the right knee joint is indicated. Based on those findings as well as blood pressure elevation, significant obesity, and probably mild chronic bronchitis, Dr. Chodosh found that Plaintiff was able to stand, walk, sit, and bend over at the waist frequently. Further, he found that Plaintiff cannot squat or kneel effectively, but he can lift and carry forty pounds occasionally and lesser weights more frequently, handle objects, see, hear, and speak. (R. 496–97.)

### 3. Dr. Brown

Dr. Robert Brown, a non-examining state agency physician, assessed Plaintiff's physical RFC on June 9, 2014. He determined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. He also found that Plaintiff could sit, stand, and/or walk for about six hours in an eight-hour workday. Further, Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds as well as occasionally balance, kneel,

crouch, and crawl. He could also frequently stoop. Dr. Brown also found

that Plaintiff has environmental limitations, including avoiding concentrated

exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor

ventilation, and hazards. (R. 94–96.)

### 4. Dr. Bruno

Dr. Julie Bruno, a non-examining state agency psychologist,

assessed Plaintiff's mental RFC on May 22, 2014. Dr. Bruno found that

Plaintiff had sustained concentration and persistence limitations. According

to Dr. Bruno, Plaintiff could have difficulty maintaining ideal levels of

concentration, accuracy, patience, dependability, and productivity,

particularly in socially intense work environments that require multitasking

under time pressure. Plaintiff, however, could attend and persist for two-

hour intervals to accomplish a straightforward task with recurring or

uniform steps. (R. 97–98.)

Dr. Bruno also found that Plaintiff has social interaction and

adaptation limitations. Dr. Bruno noted that Plaintiff would benefit from a

work-like environment that de-emphasizes social interactions and provides

firm supervision with clear expectations. Despite Plaintiff's limitations, he

could communicate about specific aspects of employment and follow

standards governing basic conduct and appearance. Further, although Plaintiff may be limited in his capacity to adjust effectively to abrupt changes, his ability to appreciate and adhere to occupational safety guidelines, secure transportation, and to do basic planning for work activities is not especially limited. (R. 98–99.)

## C.  Hearing Testimony

At the hearing on January 27, 2015, Plaintiff was 46 years old. He testified that he has an AA degree in infomatics, but the ALJ found that Plaintiff had no past relevant work. (R. 45–46.)

The ALJ's first question was how Plaintiff injured his back while hunting. Plaintiff stated that he was not helping move a deer despite the doctor's notes that say that; instead, he said he injured his back because his son was moving a deer and asked Plaintiff to hold it. When Plaintiff was then questioned about the medical reports that state that he bruised his arm shooting a bow and arrow, Plaintiff stated instead that he bruised his arm coming down steps but also said he did not know what happened. (R. 46–47.)

The ALJ then questioned Plaintiff about his most recent chest pain. Plaintiff stated that he cannot afford to see a cardiologist or to take

medication that he needs, so he only takes aspirin. He also stated that

doctors at Shands told him that it is important for him to see a cardiologist

and that they need to examine his back further. The ALJ noted, however,

that his last visit to a cardiologist in 2012 yielded normal results. (R.

48–50.)

Next, the ALJ focused on the physical assault against Plaintiff that

injured his neck and back. The ALJ noted that results of MRI tests

performed at the time of this assault revealed only "mild issues." Plaintiff

then asserted that in 2000, when he first injured his back, the MRI failed to

reveal the real issues with his back and he had to have additional tests

done. Plaintiff did, however, return to part-time work after his back injury in

2000. (R. 50–52.)

Regarding Plaintiff's mental health, Plaintiff stated that he currently

lives with his sister. He also stated that he only has one friend and does

not get out at all because it is too hard for him. When asked about how it is

hard for him, Plaintiff stated that he gets nervous and feels unsure.

Plaintiff, however, has never seen a neurologist because he could not

afford it and had no way to get there. He has seen a psychologist, but only

once because he also could not get there and could not afford it. (R.

54–55.)

As for Plaintiff's day-to-day life, he stated that he tries to help around the house and prepare meals. He also stated that he sometimes stands on the porch. Plaintiff further asserted that he feels unable to do any type of work because of his back and anxiety. (R. 55.)

Regarding Plaintiff's back specifically, he stated that he cannot move around well or bend over to pick things up. He also stated that sometimes the pain is so severe that it causes him to throw up. As for limitations, Plaintiff stated that he can only walk fifty feet, only stand leaning against something or for thirty minutes, and sit for about thirty or forty minutes. He further stated that he can only pick up and carry ten pounds. (R. 56.)

Regarding Plaintiff's anxiety, he stated that he has a very difficult time with socialization. He does not do any social activities because he has a hard time controlling his anxiety. Further, he only goes out for groceries, which occurs only once every two or three months. Plaintiff also added that he blacks out. He stated that he never realized he did this but that others have told him and it has been reported.  (R. 56–57.)

The vocational expert ("VE") also testified during the hearing in response to two hypothetical scenarios. The first hypothetical involved the following limitations: inability to stoop, crouch, kneel, bend, crawl; ability to

walk for fifty feet; ability to alternate sitting and standing for thirty-minute

periods but not for an entire eight-hour day; needs fifteen-minute breaks of

more than fifteen minutes every two hours; ability to lift and carry ten

pounds; and infrequent contact with the public and occasional contact with

coworkers. The VE found that there would not be any available jobs with

these limitations. (R.

59.)

The second hypothetical involved different limitations. These included

the ability to lift and carry ten pounds frequently and twenty pounds

occasionally; ability to sit, stand, and walk for six hours in an eight-hour

workday; occasionally climb ramps and stairs; ability to balance, stoop,

kneel, crouch, and crawl; inability to climb ladders, ropes, or scaffolds;

unrestricted use of upper extremities; ability to speak, hear, and talk; avoid

exposure to extreme cold, extreme heat, extreme wetness, vibrations,

fumes, odors, dust, gases, and hazards; ability to attend and persist to

unskilled work for two-hour intervals with normal breaks; and avoid social

interaction, having no contact with the public and only work near coworkers

not with them.    With these restrictions, the VE found that there are jobs

available. The ALJ then clarified that the jobs the VE found involve

"unskilled, simple, repetitive work without production based [inaudible]."

The ALJ also confirmed that these jobs have no interaction with the public and no cause for interaction with coworkers. (R. 60–61.)

## D.  The ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 11, 2013. The ALJ found that Plaintiff had the severe impairments of COPD, anxiety, affective disorder, status post MI with stenting in 2008, and obesity. At step three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 25.)

With respect to Plaintiff's residual functional capacity ("RFC") at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the RFC to perform less than the full range of light work. Plaintiff can lift ten pounds frequently and twenty pounds occasionally. Plaintiff can sit, stand, and walk each for six hours in an eight-hour workday. Further, Plaintiff can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. Plaintiff can balance, stoop, crouch, crawl, and knell occasionally. Plaintiff can also see, hear, and talk without limitations, and he can use his upper extremities without restriction. He can perform simple unskilled work with no fast-paced production-paced demands with normal breaks every two

hours. Plaintiff, however, must avoid exposure to extreme cold, hear, and wetness, as well as fumes, odors, dusts, gases, vibrations, heights, and hazards. He also may not have contact with the public and should not work with coworkers in tandem. (R. 26.)

In regard to the severity of his impairments, Plaintiff stated that he can lift and carry ten pounds, walk for fifty feet, and stand and sit for thirty minutes at a time. He has difficulties socializing and being around people. He also stated that he helps around the house and prepares meals and that he shops for groceries only once every two or three months. (R. 27.)

The ALJ, however, concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. The ALJ noted that Plaintiff's credibility was diminished by the fact that he went on a hunting trip; has not undergone back surgery or scheduled any for the future—nor has such surgery been recommended; he is not compliant with medication, and even refused free medication; although he has COPD, he continues to smoke; and he has no record of any inpatient mental health treatment. (R. 28–29.)

In addition to examining the medical evidence, the ALJ also

considered the opinion evidence from Dr. Benet, the consultative examiner for Plaintiff's mental health, and Dr. Chodosh, who performed a physical consultative examination. Dr. Benet determined that Plaintiff could perform work-related mental tasks but would have moderate difficulty performing tasks involving sustained concentration, persistence, social interaction, and adaption. The ALJ gave Dr. Benet's assessment significant weight as unbiased and supported by the overall record.

Dr. Chodosh found Plaintiff capable of light exertional activity but with postural restrictions. The ALJ gave this great weight as the opinion is unbiased and recent. The ALJ incorporated these findings as well as those of the state agency physician, which the ALJ gave significant weight as unbiased and generally supported by the medical records as a whole, into the RFC. (R. 28–29.)

The ALJ determined at step four that Plaintiff has no past relevant work. Regardless, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Accordingly, the ALJ concluded that Plaintiff has not been under a disability from October 11, 2013, through the date of the ALJ's decision. (R. 29–30.)

# IV.  DISCUSSION

Plaintiff raises three arguments on appeal: (1) the ALJ improperly relied upon the VE's response to a hypothetical question because the hypothetical did not include all limitations; (2) the ALJ failed to fully and fairly develop the record by not ordering an x-ray of Plaintiff's right knee; and (3) the Commissioner failed to properly consider the impact of Plaintiff's obesity on his ability to perform work. (ECF No. 19.)

**A. The hypothetical posed to the VE included all limitations stated in the ALJ's RFC finding, and the results yielded three jobs that do not require any crouching or kneeling, making the lack of inclusion of any such limitations harmless.**

Plaintiff argues that the ALJ improperly relied on the VE's response to the hypothetical because it did not include the ALJ's findings as to Plaintiff's limitation to "simple unskilled work with no fast paced production paced demands with normal breaks every two hours" or Plaintiff's inability to squat or kneel effectively. (ECF No. 19 at 14–15.)

The ALJ did, however, include in the limitations provided to the VE the requirement that the jobs include simple unskilled work with no fast-paced production-paced demands with normal breaks every two hours. At the hearing, the ALJ stated the following to the VE during the hypothetical: "Add on to that, that he would have the capacity to attend and persist to

unskilled work for two-hour intervals with normal breaks." (R. 60.) Then,

once the VE provided three jobs, the ALJ followed up with a question:

"First of all, Mr. Capps, how do you know that these jobs are such that they

are unskilled, simple, repetitive work without production based [inaudible]?"

(R. 61.) The VE responded that the VE had observed the three

occupations in different work environments and that the VE's detailed

knowledge of the *Dictionary of Occupational Titles* enabled the VE to

confirm the simple, unskilled nature of these jobs. (*Id.*)

　　　Although the transcript does not include the words following "product

based," reasonably the word was "demands," mirroring the ALJ's language

in her opinion. Remanding the case to fill in the inaudible word from the

hearing transcript or to address only a slight variation in language is

unnecessary because the result would be the same. Accordingly, the VE's

response to the hypothetical included the ALJ's own added limitations

regarding Plaintiff's ability to work, and thus the ALJ's reliance on the VE's

response was not improper.

　　　Plaintiff also asserts that the ALJ did not include in her hypothetical

to the VE that Plaintiff could not squat or kneel. Plaintiff argues that

although the ALJ credited Dr. Chodosh's opinion, the ALJ failed to state

why the ALJ did not include Dr. Chodosh's finding that Plaintiff could not

squat or kneel effectively in her RFC finding. (ECF No. 19 at 18.)

Inconsistent with Dr. Chodosh's findings, the ALJ advised the VE that the

hypothetical individual could only occasionally kneel and crouch. (R.

59–60.)  Plaintiff contends that the ALJ needed to resolve this

inconsistency and explain the basis for not crediting all aspects of Dr.

Chodosh's opinion. (ECF No. 19 at 21.) Further, because the hypothetical

presented to the VE did not include Dr. Chodosh's limitations, Plaintiff

asserts that the ALJ's findings were improper as based on an incomplete

hypothetical. (*Id.*)

Although the ALJ did not include Dr. Chodosh's limitations of an

inability to squat or kneel in the hypothetical posed to the VE and failed to

explain why she ultimately concluded that Plaintiff could kneel and crouch

occasionally in her RFC findings, any potential error is harmless. Each of

the three jobs that the VE found using the ALJ's hypothetical were jobs that

did not require any crouching or kneeling according to the *Dictionary of

Occupational Titles*.[6] (R. 60–61.) Because none of these jobs require

---

[6] The three jobs the VE mentioned in response to the hypothetical were
Warehouse Checker, Assembler of Small Parts, and Labeler. (R. 60–61.) When
reviewing each of these occupations in the *Dictionary of Occupational Titles*, each job
includes the notation "Not Present - Activity or condition does not exist" for both
kneeling and crouching. *See 222.687-010 Checker I*, DICTIONARY OF OCCUPATIONAL
TITLES (4th ed. 1991), 1991 WL 672130; *706.684-022 Assembler, Small Products I*,
DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991), 1991 WL 679050; *229.587-018
Ticketer*,  DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991), 1991 WL 672150.

crouching or kneeling, whether the ALJ had included the limitation of an

inability to squat or kneel would not have had any impact on the VE's

findings.

Jobs exist in the national economy for an individual with the

claimant's age, education, work experience, and RFC—even with the

added limitation of an inability to squat or kneel. Thus, no need exists to

remand the case for the ALJ to formulate a new hypothetical with these

additional limitations or for the ALJ to expound on why she did not include

them in her original hypothetical or her RFC findings.

## B. The ALJ did not fail to fully and fairly develop the record by not ordering an x-ray of Plaintiff's right knee.

Plaintiff argues that the ALJ failed to fully and fairly develop the

record because the ALJ did not order an x-ray of the right knee joint as Dr.

Chodosh recommended. (ECF No. 19 at 22.) Although the ALJ does have

a duty to fully and fairly develop the record, the ALJ was not required to

order the recommended x-ray and therefore did not fail to fulfill this duty.

In this case, the ALJ adequately developed the record, including

obtaining consultative examinations where necessary to do so. The ALJ, in

developing the record, must order a consultative examination or obtain

medical expert testimony where the record contains insufficient evidence

for the ALJ to make an informed decision. *See Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999). Here, Dr. Chodosh performed a physical consultative examination on Plaintiff, and Dr. Bruno performed a mental consultative examination.

Plaintiff asserts that "the record provided abundant support for the necessity of [an x-ray]." (ECF No. 19 at 24.) Plaintiff, however, failed to provide citations to the record that show the need for an x-ray beyond Dr. Chodosh's opinion recommending one. No other doctor recommended an x-ray of Plaintiff's knee, and Plaintiff never asserted knee pain as a basis for his disability. The ALJ is not required to do more than necessary to obtain sufficient evidence for the ALJ to make an informed decision—including following doctors' recommendations.

Further, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record." *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (citing *Brown v. Shalala*, 44 F.3d 931, 934–25 (11th Cir. 1995)). Prejudice has been found when the record "has evidentiary gaps which result in unfairness or 'clear prejudice.'" *Brown*, 44 F. 3d at 935 (quoting *Ware v. Schweiker*, 651 F. 2d 408 (5th Cir. Unit A July 1981)).  An ALJ, however, is

not required to order medical evidence to have a complete record unless the record establishes that it is necessary to enable the ALJ to render his decision. *Holladay v. Bowen*, 848 F. 2d 1206 (11th Cir. 1988); *Kelly v. Heckler*, 761 F. 2d 1540, 1540 (11th Cir. 1985). Because the ALJ developed a complete record of medical and opinion evidence and was able to render a decision without the x-ray, Plaintiff cannot show prejudice in this instance or the need to develop the record further.

There is no ambiguity or inadequacy in the record before the ALJ in this case that would trigger a duty to further develop the record. The only doctor to recommend an x-ray of Plaintiff's right knee was Dr. Chodosh. Yet when comparing Dr. Chodosh's conclusions to those of the ALJ, the inconsistency pointed out by Plaintiff in the findings is that Dr. Chodosh noted that Plaintiff was unable to squat or kneel effectively. As mentioned above, however, this inconsistency is harmless as to the finding that Plaintiff is not disabled under the Social Security Act. Accordingly, Plaintiff was not prejudiced by the ALJ not ordering an x-ray of his left knee. Without a showing of prejudice, a case will not be remanded to the ALJ to more fully develop the record.

## C. The ALJ did not fail to properly consider the impact of Plaintiff's obesity on Plaintiff's ability to work.

Plaintiff argues that although the ALJ found Plaintiff's obesity to be a severe impairment, the ALJ failed to properly consider its impact on Plaintiff's ability to perform work in accordance to Social Security Ruling 02-01p. Plaintiff states that the ALJ failed to reference the ruling of obesity as a severe impairment and how obesity impacts Plaintiff's ability to work. (ECF No. 19 at 24–27.)

That SSR guides the evaluation of obesity in disability claims and was published following the deletion of Listing 9.09, Obesity, from the Listing of Impairments.  *See* 67 Fed. Reg. 57859, 57860-61 (Sept. 12, 2002).  The SSR recognizes that obesity is a risk factor that increases the chance of developing impairments in other body systems, including the cardiovascular, respiratory, and musculoskeletal body systems.  *Id*.  The SSR provides that the ALJ should consider the effect of obesity at each step of the sequential evaluation:

> [T]he combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.... [A]djudicators [should] consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

*Id.* at 57861–62.

Here, the ALJ found that Plaintiff's obesity was a severe impairment at step two of the sequential analysis. (R. 25.) Further, in evaluating Plaintiff's RFC at step four, the ALJ specifically noted that she took into account the effects of Plaintiff's obesity and the effects of his obesity in combination with the medical evidence of record. (R. 26.) The ALJ expressly noted Dr. Benet's finding of an obese BMI of 38.4 as well as Dr. Chodosh's statement that Plaintiff weighed 289.5 pounds, and she gave both of the opinions containing this information great weight. (R. 28.) The ALJ also noted the 2012 medical notes from Clark County Jail that state that Plaintiff was obese but that he did not have any pitting edema. (R. 27.) The ALJ stated that although Plaintiff complained of pain and swelling while incarcerated, officials also observed him walking and climbing stairs. (*Id.*) Plaintiff even asked to go on work detail. (*Id.*). Plaintiff does not point to any other evidence about specific limitations caused by his obesity beyond those noted by the ALJ.

Accordingly, the record supports a conclusion that the ALJ fully and properly considered Plaintiff's obesity and the functional limitations arising therefrom in combination with Plaintiff's other impairments in evaluating his

RFC. The ALJ concluded that the combined effect of Plaintiff's obesity in conjunction with the medical evidence of record did not meet or medically equal any listed impairments. (R. 26.) Further, the ALJ's RFC determination accounted for Plaintiff's obesity and his other impairments by limiting Plaintiff to less than the full range of light work with additional postural and environmental limitations.  (R. 26–27.) Accordingly, Plaintiff's argument that the ALJ erred by failing to address Plaintiff's obesity as required by the Social Security Ruling has no merit.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 22nd day of November 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party**

fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.